## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

**MARK WILLAR**                )        **Complaint for Employment**
601 Holland Lane #504      )        **Discrimination**
Alexandria, VA 22314       )
                               )
     **Plaintiff,**           )
                               )
     **v.**                  )        **Case No. _____**
                               )
**MARK T. ESPER, Ph.D.**     )
**in his official capacity as**      )        **Jury Demand**
**Secretary, Department of Defense** )
1000 Defense Pentagon      )
Washington, D.C. 20301-1000   )
                               )
     **Defendant.**         )
                               )
_____)

## COMPLAINT AND JURY DEMAND

### Preliminary Statement

1.     This is a civil action against the Secretary of the U.S. Department of Defense

("DoD"), Dr. Mark T. Esper, for damages for injuries Plaintiff Mark Willar ("Willar") sustained

as a result of the Missile Defense Agency's ("MDA" or "Agency") discrimination on the basis of

his disability and retaliation after he requested a reasonable accommodation, in violation of the

Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*

### Jurisdiction and Venue

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28

U.S.C. § 1343.

3.     This Court may grant declaratory relief pursuant to 28 U.S.C. § 2201(a).

4.     Venue lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because the

discriminatory and retaliatory employment practices alleged herein were committed in this District, and but for the unlawful employment practices, Willar would have worked in this District.

## Parties

5.      Plaintiff Mark Willar is a citizen of the United States and resides at 601 Holland Lane #504, Alexandria, Virginia 22314.

6.      The Missile Defense Agency is a research, development, and acquisition agency within the DoD, which previously employed Willar from February 19, 2017 to October 2018.

7.      Defendant Dr. Mark T. Esper is the Secretary of the DoD, an executive branch department which supervises the federal government's national security functions.  Defendant Esper's principal office is located at the Pentagon in Arlington, Virginia.

## Factual Allegations

### Willar's Disability

8.      Willar suffers from Reactive Airway Dysfunction Syndrome ("RADS"), a lung disease he developed as a result of his exposure to tear gas, and which impairs his breathing.

9.      RADS is aggravated by high-level exposure to corrosive vapors, fumes, gases, or other irritants.

10.      RADS substantially limits Willar's lung capacity and pulmonary function, and as a result, his breathing, in all areas of his life. Due to RADS, Willar becomes easily winded and cannot catch his breath.

11.      When Willar walks quickly or walks up an incline or stairs, he becomes winded easily, must slow down, or must take multiple breaks. RADS has limited Willar's ability to hike. It forces him to avoid steep uphill ascents and to slow his pace.

2

12.     RADS impedes Willar from carrying heavy objects, walking upstairs while carrying extra weight, and climbing multiple flights of stairs. For example, Willar becomes winded when traveling up one flight of stairs to his apartment while carrying two bags of groceries.

13.     RADS impairs Willar's ability to work out and play sports. For instance, he can no longer play basketball or softball, as he used to do before he developed RADS. When Willar rollerblades, he must slow down his pace considerably. The amount of weight and the number of repetitions he can lift during a workout has decreased substantially.

14.     Willar uses an inhaler, which slightly improves his lung function during the short-term, but does not eliminate the symptoms or solve his underlying medical issue.

15.     As of a result of RADS, Willar must use a respirator to protect his lungs from airborne irritants in certain settings, including in the manufacturing plants in which he has worked.

16.     Willar's physician issued an order on April 27, 2015 confirming that he requires a respirator for work in certain settings.

17.     Willar used a respirator during his prior employment as a Quality Manager at a BAE Systems manufacturing plant, and as a Process Quality Engineer at Naval Air Station Patuxent River ("NAVAIR") Defense.

18.     Willar also uses a mask at home when he works with products containing strong vapors, such as spray-on oven degreasers, mineral spirits, spray paint, stain, and fiberglass insulation.

19.     He avoids ammonia cleaners at home, second-hand smoke, and gasoline fumes from refueling his vehicle by walking at least five or six yards away from his vehicle while fuel

is being pumped.

### Willar Applied for a Position with the Missile Defense Agency.

20.     In the summer of 2016, Willar applied for a position as an MDA Assurance Representative (General Engineer, NH-0801-04/04) based in an Elkton, Maryland manufacturing facility owned and operated by Orbital ATK (now Northrop Grumman Innovation Systems), located at 55 Thiokol Road, Elkton, Maryland 21921, in Cecil County (the "Elkton facility").

21.     As an MDA Assurance Representative ("MAR"), Willar would oversee the quality assurance of the missile defense system hardware components that Orbital ATK developed, tested, and manufactured for MDA under contract with the Department of Defense.

22.     Kevin Sheahan, MDA's Quality Safety Integration Chief, interviewed Willar for the position on September 28, 2016.

23.     On, November 15, 2016, the Agency offered, and Willar accepted, the MAR position, subject to satisfactory security clearance, acquisition review, and sustainability determinations.

24.     Willar began his employment with MDA on February 19, 2017, and he was scheduled to begin working at the Elkton facility on February 28, 2017.  MDA subsequently moved his start date to March 1, 2017.

25.     Willar reported to Sheahan as his direct supervisor and Michael Wadzinski, MDA's Director of Quality and Safety, as his second-line supervisor.

26.     Prior to his start date, on February 14, 2017, Willar requested a Compressed Work Schedule ("CWS"), which Sheahan approved. The CWS was based on nine-hour shifts Monday through Thursday, and an eight-hour shift every other Friday.

<u>Willar's Notice of Disability and Request for a Reasonable Accommodation.</u>

27.     On February 16, 2017, Willar notified Sheahan via email that he suffers from RADS, and he requested to use a half-mask respirator in the Elkton facility as a reasonable accommodation for his disability.

28.     Willar explained that depending on which irritants were present in the air, he may require different filters in his respirator.

29.     He requested that MDA provide the material safety data sheets ("MSDS")[1] for the areas of the Elkton facility in which he would work. The MSDS files list the respiratory irritants, chemical compositions, and safety requirements that would enable Willar to determine the suitability of his current filter.

30.     Upon receiving notice of Willar's disability and his request for a reasonable accommodation, Sheahan emailed MDA's Equal Opportunity Assistant and copied Wadzinski and Thomas Fisher, Deputy MDA/Quality Safety Inspection ("QSI") who had previously served as the MAR at the Elkton facility, and stated the following:

> Willar just disclosed to MDA today (see below) that he has a medical condition. He did not disclose this prior to today. . . . I personally believe this candidate was not up-front with MDA.

31.     Prior to February 16, 2017, MDA never asked Willar whether he would need to use a respirator to perform his work as a MAR, and never inquired whether Willar had any condition that would prevent him from performing the purportedly essential functions of a MAR at the Elkton facility.

32.     In response to Sheahan's email, Fisher wrote:

> ??????????????????? - how could he apply for a position at Orbital ATK, a site that manufactures freaken [sic] solid rocket motors with a lung condition?...where OA

---

[1] The Occupational Safety and Health Administration now refers to MSDS as Safety Data Sheets ("SDS").

grinds, mix, and manufactures grain components that commonly uses ammonium perchlorate, ammonium nitrate,(HTPB) Hydroxyl-terminated polybutadiene,

ahhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhh!!!!!!!!!!!!

33.     The following day, on February 17, 2017, in response to Willar's request, Sheahan asked him to provide the model number and manufacturer of the respirator he owned at the time, purportedly "so [MDA] can check with Orbital-ATK to see if it is permitted in their Elkton MD manufacturing spaces."

34.     After Willar provided the requested information, Sheahan asked Willar whether he had been "medically cleared by a doctor" to work in a rocket motor and ordnance manufacturing plant, whether he could "have conversations with technicians and floor personnel when wearing" the mask, and whether he had a recommendation for determining the appropriate filters for the respirator.

35.     Willar responded that he can have conversations while using the mask and that he had never previously been required to provide a medical clearance to work in any type of manufacturing facility.

36.     Instead of providing Willar the MSDS files or other detailed information about the airborne particles, vapors, or hazardous processes at the Elkton facility, Sheahan told Willar that Orbital ATK uses "100's of different chemical[s]" and that the quantity of corresponding MSDS files would be "several inches thick."

37.     Willar responded that the filter he owned should suffice, but he reiterated his request for more information—including information about whether dust, vapor, or both were present in the Elkton facility.

38.     Later on February 17, 2017, Sheahan wrote to Fisher about Willar again, and stated, "I am amazed he [Willar] even applied for this position. It's only the worst case manuf

[sic] plant wrt [sic] chemicals, in the world, that MDA does business in."

<u>MDA Pre-Determined that It Would Deny Willar's Request for a Reasonable Accommodation
Without Basis and Without Engaging in the Interactive Process.</u>

39.     MDA made no effort to determine what types of respirators, if any, Orbital ATK

allowed its own employees to use in the Elkton facility.

40.     MDA made no effort to work with Orbital ATK to determine what types of

respirators, if any, Orbital ATK would allow Willar to wear in its Elkton facility.

41.     Instead, MDA asked Orbital ATK to provide written justifications for MDA's

pre-determined conclusion that MDA would not allow Willar to work as a MAR in the Elkton

facility, so that MDA could cite those purported justifications in denying Willar's request for a

reasonable accommodation.

42.     Specifically, on February 17, 2017, Fisher emailed Jim Tedesco, Orbital ATK's

Director of Safety and Security for Missile Defense and Controls at the Elkton facility, and

provided suggested justifications for why Orbital ATK should prohibit Willar from wearing the

respirator he owned in the Elkton facility:

> 1. Will OA not allow Willar to use his personal respirator during manufacturing
> surveillance of MDA product due to liability concerns in OA manufacturing and
> test areas? For example: use in areas C-56, C-52, H-4, propellant mixing,
> hardware test areas, etc.?
>
> 2. Will OA not allow Mr Willar to use his personal respirator due to **product
> risks** at the OA site? For example, is respirator use a product contamination
> hazard? 3. Will OA Elkton, MD not allow Mr Willar to wear this personal
> respirator due to **safety concerns** at the OA site? For example an ESD hazard,
> communication hazard, etc. - if worn during hazardous operations or in live
> ordnance areas?
>
> 4. [sic] Are there any other Orbital ATK concerns/issues with the use a personal
> respirator at the OA site?
>
> Understand, this scenario was not anticipated by me and a response would be
> appreciated.

(Emphasis added).

43.    Tedesco responded as Fisher had suggested, and stated that Orbital ATK would not allow Willar to wear his personal respirator, brand and model number 3M 7502/37082, purportedly due to "product safety" and "personnel safety" concerns.

44.    Willar never asked or demanded that he be allowed to use "his personal respirator," and no other respirator.

45.    Notably, Tesdeco did not state that Orbital ATK would not allow Willar to wear a respirator issued by Orbital ATK.

46.    Tedesco claimed that Orbital ATK could not allow Willar to use a silicone respirator like the one Willar owned "due to the risk of product contamination from the silicone material" and because of the "replaceable piece parts on the mask…." Yet Orbital ATK allows its own employees to use silicone respirators with replaceable parts throughout the Elkton facility.

47.    MDA knew in February 2017 that Orbital ATK employees used half- and full-mask silicone respirators when handling hazardous material, performing propellant mixing operations, and cleaning up after propellant casting, among other tasks.

48.    Additionally, disposable respirators are used throughout the Elkton facility during the following processes: preparation of Third Stage Rocket Motor ("TSRM") components, component bonding, integration and manufacturing build up, abrasion of Pulse I and II propellant tool-up, sanding of the 5.75" bottles, sanding of the insulated igniter cases, sanding of safe and arm insulators, bonding preparation and adhesive operations, and preparation and abrasion of the TSRM strake brackets for bonding to the composite case.

49.    By February 28, 2017—twelve days after Willar disclosed his disability—Fisher had determined that MDA would never allow Willar to work as a MAR. In an email dated

8

February 28, 2017, Fisher told Sheahan, "Willar is (now) not a QSI employee due to his latent medical disclosure."

<u>MDA Discriminated Against Willar Because of His Disability and Retaliated Against Him Because He Requested a Reasonable Accommodation.</u>

50.     On February 21, 2017, Willar reported to Fort Belvoir for the hiring-in process, but he was precluded from completing that process. When Willar was waiting to take his oath to uphold the U.S. Constitution, he was pulled out of line and subsequently excused, without completing the process.

51.     Upon information and belief, MDA intentionally delayed Willar's in-processing because MDA was trying to determine whether it could revoke its already-accepted offer of employment to Willar, or fire Willar, because he had not voluntarily disclosed his disability before MDA made its offer of employment.

52.     When MDA determined that it could not fire Willar or otherwise revoke its employment offer because Willar did not voluntarily disclose his disability, Willar was required to return to Fort Belvoir to complete the hire-in process on March 6, 2017, and his records were back dated to February 21, 2017.

53.     Willar took paid time off work from February 22, 2017, until February 24, 2017, in order to move into his new home in Bear, Delaware, approximately ten miles away from the Elkton facility, due to his new position there.

54.     Since Willar still was not processed in, on March 1, 2017, he was prohibited from reporting to the Elkton facility for work due to his request for a reasonable accommodation.

55.     Sheahan notified Willar by email that MDA required him to undergo a medical evaluation by the U.S. Department of Health and Human Services' Federal Occupational Health ("FOH") Program to assess his disability.

56.     As part of the FOH evaluation process, on February 21, 2017, Willar authorized his physician, Dr. Stella Hines, who specializes in occupational pulmonary medicine, to "furnish information from the record of [Willar] which is in the record system of [her] facility" to the FOH Program for the purpose of evaluating Willar's reasonable accommodation request.

57.     On March 6, 2017, Wadzinski issued a memorandum which placed Willar on a purportedly "temporary" detail assignment to the ABQ office in Dahlgren, Virginia, effective March 13, 2017, pending resolution of his request for a reasonable accommodation.

58.     The ABQ office in Dahlgren, Virginia is located approximately 150 miles from Willar's residence in Bear, Delaware.

59.     Sheahan described the detail as an "estimated 2-week trip to our offices in Dahlgren VA where you can do some office work while waiting for the medical assessment with Federal Occupational Health."

60.     MDA did not provide Willar a job description for the new Dahlgren position and, upon information and belief, no such description existed.

61.     At Dahlgren, Willar reported to Kendall Miller, ABQ Manager.

62.     On March 7, 2017, Willar emailed Sheahan and requested permission to begin the MAR job for which he was hired at the Elkton facility.

63.     Willar also requested additional information about the availability of other temporary detail options, the anticipated duration of the "temporary" Dahlgren assignment, and the purpose and scope of the FOH medical assessment.  Sheahan never responded to Willar's email.

64.     On or about March 14, 2017, MDA revoked Willar's CWS, which it had previously approved.

65.     At the same time, MDA permitted several Dahlgren individuals, including Sonny Lavassani, Fred Perkins, and William Ward, to work a CWS.

66.     Because Willar lived in Bear, Delaware but worked Monday through Friday in Dahlgren, Virginia during his "temporary" assignment, Willar had no choice but to make weekly hotel accommodations in Dahlgren and stay there during the week.

67.     This arrangement disrupted all aspects of Willar's personal life and prevented him from attending worship services, maintaining personal relationships, and participating in social and recreational activities during the week.  It negatively impacted his diet and sleep patterns.

68.     Moreover, because there were no qualified medical specialists in the Dahlgren area, Willar was forced to drive for hours to attend necessary medical appointments during the work week in Dahlgren.

69.     On March 21, 2017, Willar again requested information from Sheahan about the chemicals and processes present at the Elkton facility, including relevant MSDS files.  Willar explained that he had an appointment with his lung specialist on March 30, 2017, and sought to discuss the information with his doctor.

70.     Willar also asked for information about the type of respirators Orbital ATK was reviewing for Willar's potential use.

71.     Sheahan responded only that Anita Boush would be Willar's "contact for this."

72.     Boush, MDA's Director of Equal Opportunity and Diversity Management, followed up with Willar and refused to provide any information, stating, "As we continue through the process, all these questions will be fleshed out for you.  Please allow the process to run its course so that we can get the answers we all need to make the decision that best suits your needs and that of the agency."

73.     Willar repeated his request to Boush on March 23, 2017, and again, she stated that she would provide "no further information" about the facility's air quality "until the FOH completes the full medical assessment."

74.     On March 31, 2017, at the suggestion of his doctor, Willar asked Boush for information about the types of respirators Elkton facility employees wear while working in the plant, but she refused to respond, even though MDA had access to this information.

75.     As of April 11, 2017, MDA still had not scheduled Willar's appointment with the FOH physician, which it allegedly required to evaluate his request for a reasonable accommodation.

76.     On that date, Kelly Whatley, Affirmative Employment Specialist at MDA's Office of Equal Opportunity, emailed FOH and admitted, "[W]e are in a bad position with this employee [Willar]. He was hired for a certain position and we have not given him a valid reason for not letting him enter the building. The medical evaluation is the only way we will be able to validate our position."

77.     Willar met with the FOH contracted-pulmonologist, Dr. Ira Tauber, on or around May 15, 2017, approximately three months after Willar requested a reasonable accommodation, and about two and a half months after MDA "temporarily" detailed Willar to the ABQ office in Dahlgren, Virginia.

78.     Following Dr. Tauber's examination, FOH reported to MDA, "Dr. Tauber indicated that Willar would likely benefit from the use of a respirator if in an environment with potentially irritating substances but could not say whether he needs more enhanced respiratory protection than that which is offered to other workers in the plant."

79.     On or about April 27, 2017, Willar applied for a position as an MDA General

Engineer (NH-0801-04/04) based in Orlando, Florida.

80.     On May 8, 2017, Willar received notice that he was "qualified for the position," and that his name had been certified to the selecting official for consideration.

81.     However, two days later, on May 10, 2017, Willar received notice that the MDA had "decided not to fill the position at this time," without any further explanation.

82.     Still having received no information about his request to wear a respirator at the Elkton facility, on June 20, 2017, Willar requested that as a reasonable accommodation, MDA permit him to perform his Dahlgren work, or any other MDA work, from the Elkton facility.

83.     Sheahan denied that request on July 27, 2017, and stated, "MDA cannot allow an MDA employee to reside in a commercial company facility and perform daily duties not associated with the work performed at that site."

84.     However, MDA permits other employees to perform work for offices other than those to which they are assigned.

85.     For example, MDA permitted Ray Chowdhury, an MDA Mission Assurance Engineer to perform QSI work for the Elkton facility while he physically worked in Dahlgren.

86.     MDA also permitted Fisher to perform non-Elkton work from the Elkton facility.

87.     On July 19, 2017, Willar emailed Boush and asked her if she required a copy of his doctor's order for a respirator.  Boush never responded to his email.

88.     On or about August 9, 2017, because MDA would not allow Willar to work at a "commercial" facility, Willar requested instead that as a reasonable accommodation, MDA permit Willar to work at any "government owned location" closer to his residence in Bear, Delaware, where he could perform (1) his Dahlgren duties; (2) the MAR duties which he was hired to perform at the Elkton facility; and/or (3) any other type of work for MDA, DoD, or the

13

federal government.

89.     Sheahan denied that request on September 6, 2017, based on pre-textual grounds.

90.     On August 29, 2017, Miller started coercing Willar to accept a job offer (control number 477188000) for a position as a Supervisory General Engineer based in Dahlgren, Virginia.  The job posting was for a permanent position, which Miller purportedly sought Willar to accept on a "temporary" basis, until it was filled, because MDA had struggled to fill the vacancy.

91.     The job duties for the Dahlgren position were substantially different from those for the Elkton MAR position, for which MDA hired Willar.  For example, the Dahlgren position was a lead engineer role, which included supervisory responsibilities, whereas Willar applied for the Elkton position because it did not have supervisory status. The Dahlgren position also required Willar to travel to a construction site in Poland.

92.     Miller warned Willar that he wanted to be able to tell Sheahan that Willar "did everything we asked him to do" while detailed to Dahlgren, and threatened that he could not make such a positive report to Sheahan, unless Willar accepted the Dahlgren position.

93.     On November 14, 2017, Sheahan formally denied in writing Willar's request to wear a respirator at the Elkton facility while performing the duties of an MAR.

94.     As a result, MDA forced Willar to accept the permanent position in Dahlgren.

<u>Exhaustion of Administrative Remedies</u>

95.     On or about April 4, 2017, Willar began the Equal Employment Opportunity ("EEO") counseling process by submitting a pre-complaint intake form to MDA.

96.     On May 22, 2017, Willar submitted his formal EEO complaint, alleging discrimination based on his disability and retaliation for requesting a reasonable accommodation.

97.     On April 7, 2017, Sheahan emailed Miller and Fisher and stated, "Mark Willar has filled [*sic*] an EEO complain[t] against MDA stating we discriminated against him for health reasons. Myself, Fisher, Wadzinski, you [Kendall Miller], HR's Anita Boush and HR's Angela Carsten are all specified in his complaint."

98.     180 days have passed since Willar filed his formal EEO complaint. No appeal has been filed, and final action has not been taken. 29 C.F.R. § 1614.407(b).

### COUNT I—DISABILITY DISCRIMINATION IN VIOLATION OF THE REHABILITATION ACT OF 1973, 29 U.S.C. §§ 701 *et seq.*

99.     Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 98 above, as though restated herein.

100.    The Rehabilitation Act of 1973 prohibits employment discrimination against federal employees on the basis of their disability, 29 U.S.C. § 791, and bars a federal employer from denying a reasonable accommodation to an employee with a disability, 29 C.F.R. § 1630.9(a).

101.    Plaintiff suffers from Reactive Airways Dysfunction Syndrome (RADS), which substantially limits his lung capacity and pulmonary function.

102.    Plaintiff notified Sheahan and Fisher by email dated February 16, 2017, that he suffers from RADS.

103.    MDA discriminated against Plaintiff on the basis of his disability when it denied the following requests he made for a reasonable accommodation: (1) on July 27, 2017, Sheahan denied Plaintiff's request to perform his Dahlgren work, or any other MDA work, from the Elkton facility; (2) on September 6, 2017, Sheahan denied Plaintiff's request to perform his Dahlgren duties, the MAR duties which he was hired to perform at the Elkton facility, or any other type of work for MDA, the DoD, or the federal government from a facilitiy closer to his

15

residence in Bear, Delaware; and (3) on November 14, 2017, Sheahan denied Plaintiff's request to wear a respirator while performing those MAR duties that required his physical presence in manufacturing areas of the Elkton facility.

104.   Plaintiff could perform the essential functions of his job as an MAR at the Elkton facility while using a respirator.

105.   Willar's physician issued an order on April 27, 2015, confirming that he requires a respirator for work in certain settings.

106.   Orbital ATK allows its own employees to use silicone and non-silicone half- and full-face respirators with replaceable parts throughout the Elkton facility.

107.   Although MDA claimed that Plaintiff could not perform duties for an office other than the one to which he was assigned, it permitted Chowdhury to perform QSI work for the Elkton facility while assigned to Dahlgren, and it permitted Fisher to perform non-Elkton work from the Elkton facility.

108.   Similarly, Plaintiff could perform the duties of his "temporary" detail—or other MDA, DoD, or federal government duties—from the Elkton facility or any government-owned facility closer to his residence in Bear, Delaware, but MDA did not engage Plaintiff in any interactive process with regard to these requests for reasonable accommodation.

109.   MDA pre-determined the outcomes of Plaintiff's requests for a reasonable accommodation and denied his requests on pre-textual *post hoc* bases, without engaging Willar in a good faith interactive process.

110.   As a result of Defendant's discriminatory denials of Plaintiff's requests for a reasonable accommodation, Plaintiff has suffered past economic losses, damage to his professional reputation, emotional distress, and pain and suffering.

## COUNT II—RETALIATION IN VIOLATION OF THE
## REHABILITATION ACT OF 1973, 29 U.S.C. §§ 701 *et seq.*

111.    Plaintiff hereby incorporates by reference each allegation set forth in paragraphs 1 to 110 above, as though restated herein.

112.    The Rehabilitation Act prohibits retaliation "against any individual because such individual has opposed any act or practice made unlawful by [the Rehabilitation Act] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the Rehabilitation Act]." 42 U.S.C. § 12203(a); *see also* 29 U.S.C. § 791(f) (incorporating 42 U.S.C. § 12203(a) into the Rehabilitation Act's standards).

113.    Plaintiff engaged in legally protected activity when he: (1) made requests for reasonable accommodations on or about February 16, 2017, June 20, 2017, and August 9, 2017; and (2) commenced the EEO process on April 4, 2017, and filed an EEO complaint on May 22, 2017, based on MDA's disability discrimination and retaliation.

114.    Defendant was aware of Plaintiff's requests for a reasonable accommodation because Plaintiff directed his requests to his supervisor, Sheahan.

115.    Moreover, as evidenced by Sheahan's April 7, 2017 email, Sheahan and Fisher, among other MDA officials, knew that Willar commenced the EEO process against them, with respect to their disability discrimination against him.

116.    Following Plaintiff's February 16, 2017 request for a reasonable accommodation, on March 1, 2017, Defendant prohibited Plaintiff from reporting to the Elkton facility to perform the MDA job for which he was hired.

117.    Sheahan specifically told Plaintiff the reason he could not report to the Elkton facility was because of his request for a reasonable accommodation.

17

118.    Moreover, Defendant retaliated against Plaintiff on the basis of his protected activity by *inter alia*: (1) refusing to provide Plaintiff with additional information—including the process information and MSDS sheets—for the respiratory irritants at the Elkton facility, which his doctor required to confirm the sufficiency of his filter; (2) deciding in February 2017 to deny Plaintiff's request to use a respirator at the Elkton facility, and subsequently concocting a pre-textual, *post hoc* justification for the denial; (3) prohibiting Plaintiff from reporting to the Elkton facility on March 1, 2017, to perform the MAR position for which he was hired; (4) on March 6, 2017, detailing Plaintiff to the ABQ office in Dahlgren, Virginia for a "temporary" assignment, effective March 13, 2017; (5) revoking approval for Plaintiff's CWS on March 14, 2017; (6) on July 27, 2017, denying Plaintiff's request to perform his Dahlgren or any MDA duties from the Elkton facility, as a reasonable accommodation; (7) on August 29, 2017, started coercing Plaintiff to accept a position based in Dahlgren, with substantially different job duties than the MAR position for which he was hired; (8) on September 6, 2017, denying Plaintiff's request to perform his Dahlgren, MAR, or any other MDA, DoD, or federal government duties from a facility closer to Bear, Delaware, as a reasonable accommodation; and (9) on November 14, 2017, denying Plaintiff's request to wear a respirator at the Elkton facility, as a reasonable accommodation.

119.    Plaintiff's requests for a reasonable accommodation and participation in the EEO process—including his informal counseling and filing of an EEO discrimination and retaliation complaint—caused Defendant's reprisal against Plaintiff.

120.    Defendant's stated reasons for its retaliation against Plaintiff, including its denials of his requests for a reasonable accommodation, are demonstrably false because: (1) Defendant permitted other MDA employees to perform tasks for offices other than those to which they were

assigned; (2) other employees at Orbital ATK's Elkton facility use silicone and non-silicone half- and full-face respirators with replaceable parts to perform hazardous operations; and (3) at least three other individuals at Dahlgren are allowed to work a CWS.

121.    As a result of Defendant's retaliation, Plaintiff has suffered past economic losses, damage to his professional reputation, emotional distress, and pain and suffering.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court grant him the following relief:

1.    Award Plaintiff compensatory and consequential damages against Defendant in an amount to be determined at trial, to redress his economic and emotional injuries;

2.    Award Plaintiff the attorneys' fees and costs he has incurred in bringing this action;

3.    Issue a declaratory judgment that Defendant discriminated against Plaintiff on the basis of his disability and retaliated against him in violation of the Rehabilitation Act; and

4.    Grant such other relief as this Court deems just and necessary.


Dated: September 20, 2019              Respectfully submitted,

                                       */s/ Kristen N. Sinisi*
                                       _____
                                       Kristen N. Sinisi, Esquire
                                       (District of Maryland Bar No. 19928)
                                       Bernabei & Kabat, PLLC
                                       1400 16th Street, N.W., Suite 500
                                       Washington, D.C. 20036
                                       Tel. (202) 745-1942
                                       Fax (202) 745-2627
                                       sinisi@bernabeipllc.com

                                       *Counsel for Plaintiff Mark Willar*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____          )

**MARK WILLAR**                                   )          **Complaint for Employment**
601 Holland Lane #504                             )          **Discrimination**
Alexandria, VA 22314                              )
                                                  )
    **Plaintiff,**               )
                                                  )
    **v.**                         )          **Case No. _____**
                                                  )
**MARK T. ESPER, Ph.D.**                          )
**in his official capacity as**                   )          **Jury Demand**
**Secretary, Department of Defense**              )
1000 Defense Pentagon                             )
Washington, D.C. 20301-1000                       )
                                                  )
    **Defendant.**                  )
                                                  )
_____          )

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.


Dated: September 20, 2019                    Respectfully submitted,



                                          */s/ Kristen N. Sinisi*
                                          _____
                                          Kristen N. Sinisi, Esquire
                                          (District of Maryland Bar No. 19928)
                                          Bernabei & Kabat, PLLC
                                          1400 16th Street, N.W., Suite 500
                                            Washington, D.C. 20036
                                            Tel. (202) 745-1942
                                            Fax (202) 745-2627
                                            sinisi@bernabeipllc.com


                                          *Counsel for Plaintiff Mark Willar*