IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARK WILLAR,

    Plaintiff,

v.

MARK T. ESPER, Ph.D., in his official capacity as Secretary, Department of Defense,

    Defendant.

Civil Action No.: GLR-19-2785

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Motion to Dismiss, or in the Alternative, for Summary Judgment by Defendant Mark T. Esper, Ph.D., in his official capacity as Secretary, Department of Defense ("DoD") (ECF No. 11).[1] The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons set forth below, the Court will deny the Motion.

## I.   BACKGROUND[2]

### A.   Factual Background

In November 2016, Plaintiff Mark Willar accepted a job offer from the Missile Defense Agency ("MDA"), a research, development, and acquisition agency within the

---

[1] For reasons set forth below, the Court will construe the Motion as a motion to dismiss. For the same reasons, the Court will grant Plaintiff Mark Willar's pending Motion for Discovery (ECF No. 15).

[2] Unless otherwise noted, the Court takes the following facts from Willar's Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

DoD, to work at an Elkton, Maryland manufacturing facility as an MDA Assurance Representative ("MAR"). (Compl. ¶¶ 6, 20, 23, ECF No. 1). At the time, the Elkton facility was owned and operated by a company known as Orbital ATK. (Id. ¶ 20). In the role for which Willar was hired, he expected to "oversee the quality assurance of the missile defense system hardware components that Orbital ATK developed, tested, and manufactured for MDA under contract with the Department of Defense." (Id. ¶ 21). Willar initially reported to Kevin Sheahan, MDA's Quality Safety Integration Chief, and his second-line supervisor was Michael Wadzinski, MDA's Director of Quality and Safety. (Id. ¶¶ 22, 25).

Willar suffers from Reactive Airway Dysfunction Syndrome ("RADS"), a lung disease that impairs his breathing. (Id. ¶ 8). RADS "substantially limits Willar's lung capacity and pulmonary function, and as a result, his breathing, in all areas of his life." (Id. ¶ 10). RADS impairs Willar's ability to take stairs, carry heavy objects, exercise, or play sports. (Id. ¶¶ 11–13). Willar relies on an inhaler and a respirator to mitigate the effects of RADS. (Id. ¶¶ 14–15). In particular, "Willar must use a respirator to protect his lungs from airborne irritants in certain settings, including in the manufacturing plants in which he has worked." (Id. ¶ 15).

Willar's employment with MDA began on February 19, 2017. (Id. ¶ 24). Five days beforehand, Willar requested and Sheahan approved a compressed work schedule, under which Willar would work nine-hour shifts Monday through Thursday and take off every other Friday. (Id. ¶ 26). Three days before beginning employment, Willar notified Sheahan that he suffers from RADS and requested to use a respirator at work as an accommodation

for his disability. (Id. ¶ 27). Willar also requested the material safety data sheets ("MSDS") for the Elkton facility—documents that "list the respiratory irritants, chemical compositions, and safety requirements"—which would enable him to ensure he used the correct filter in his respirator. (Id. ¶ 29).

Sheahan responded by emailing MDA's Equal Opportunity Assistant, copying Wadzinski and Thomas Fisher, MDA's Deputy for Quality Safety Inspection,[3] stating that "Willar just disclosed to MDA today (see below) that he has a medical condition. He did not disclose this prior to today. . . . I personally believe this candidate was not up-front with MDA." (Id. ¶ 30). In response, Fisher wrote: "?????????????????? - how could he apply for a position at Orbital ATK, a site that manufactures freaken [sic] solid rocket motors with a lung condition? . . . ahhhhhhhhhhhhhhhhhhhhhhhhhhhhhh!!!!!!!!!!!!" (Id. ¶ 32).

On February 17, 2017, Sheahan asked Willar to provide information about the respirator he owned so that MDA could "check with Orbital-ATK to see if it is permitted in their Elkton MD manufacturing spaces." (Id. ¶ 33). Willar provided the information. (Id. ¶ 34). In response to Willar's request for MSDS files, Sheahan wrote that Orbital ATK uses "100's of different chemical[s]" and that the quantity of corresponding MSDS files would be "several inches thick." (Id. ¶ 36). Later that day, Sheahan again wrote to Fisher, asserting that he was "amazed he [Willar] even applied for this position. It's only the worst case manuf [sic] plant wrt [sic] chemicals, in the world, that MDA does business in." (Id. ¶ 38).

---

[3] Fisher previously served as the MAR at the Elkton facility.

Fisher then wrote to Jim Tedesco, Orbital ATK's Director of Safety and Security for Missile Defense and Controls at the Elkton facility, and asked leading questions about the ability to accommodate Willar's need for a respirator, including:

> 1. Will OA [Orbital ATK] not allow Willar to use his personal respirator during manufacturing surveillance of MDA product due to liability concerns in OA manufacturing and test areas? . . .
>
> 2. Will OA not allow Mr Willar to use his personal respirator due to **product risks** at the OA site? For example, is respirator use a product contamination hazard? 3. Will OA Elkton, MD not allow Mr Willar to wear this personal respirator due to **safety concerns** at the OA site? . . .

(Id. ¶ 42) (emphasis added in Complaint). In response, Tedesco adopted the language used by Fisher in his email, stating that "Orbital ATK would not allow Willar to wear his personal respirator, brand and model number 3M 7502/37082 . . . due to 'product safety' and 'personnel safety' concerns." (Id. ¶ 43). Willar notes in his Complaint that he never insisted on using any particular respirator. (Id. ¶ 44).

Tedesco further asserted that a silicone respirator like Willar used was unacceptable "'due to the risk of product contamination from the silicone material' and because of the 'replaceable piece parts on the mask.'" (Id. ¶ 46). Willar notes, however, that "Orbital ATK allows its own employees to use silicone respirators with replaceable parts throughout the Elkton facility." (Id.). Regardless, on February 28, 2017, Fisher wrote to Sheahan and stated in unambiguous terms that "Willar is (now) not a [Quality Safety Inspection] employee due to his latent medical disclosure." (Id. ¶ 49). The following day, Sheahan emailed Willar and told him that MDA was requiring him to undergo a medical evaluation

4

by the U.S. Department of Health and Human Services' Federal Occupational Health ("FOH") Program to assess his disability. (Id. ¶ 55). Willar authorized his physician to provide information to the FOH Program. (Id. ¶ 56).

On March 6, 2017, Wadzinksi placed Willar on what he described as a "temporary" detail to an office in Dahlgren, Virginia, approximately 150 miles from Willar's home, pending resolution of Willar's request for an accommodation. (Id. ¶¶ 57–58). "Sheahan described the detail as an 'estimated 2-week trip to our offices in Dahlgren VA[.]'" (Id. ¶ 59). The following day, Willar emailed Sheahan to request additional information about other options for his temporary detail, the duration of the temporary assignment, and the FOH assessment, but did not receive a response. (Id. ¶ 63). Due to the distance between his home and Dahlgren, Willar was forced to make arrangements to stay in a hotel in Dahlgren during the week. (Id. ¶ 66). According to Willar, "[t]his arrangement disrupted all aspects of [his] personal life and prevented him from attending worship services, maintaining personal relationships, and participating in social and recreational activities during the week" and "negatively impacted his diet and sleep patterns." (Id. ¶ 67). Willar was also "forced to drive for hours to attend necessary medical appointments during the work week in Dahlgren." (Id. ¶ 68). Shortly thereafter, MDA revoked Willar's compressed work schedule. (Id. ¶ 64).

Later that month, Willar wrote to Sheahan to again request the MSDS files and other information about the chemicals present in the Elkton facility so that he could discuss the issue with his doctor. (Id. ¶ 69). Sheahan referred him to Anita Boush, MDA's Director of Equal Opportunity and Diversity Management, who did not offer a substantive response

and instead requested that Willar "allow the process to run its course." (Id. ¶ 72). When

Willar followed up, she refused to provide any additional information. (Id. ¶ 73).

On April 4, 2017, Willar submitted a pre-complaint Equal Employment Opportunity

("EEO") intake form to MDA. (Id. ¶ 95). Three days later, Sheahan emailed Fisher and

Kendall Miller, Willar's manager in Dahlgren, and notified them of Willar's complaint.

(Id. ¶ 97). Later that month, Kelly Whatley, Affirmative Employment Specialist at MDA's

Office of Equal Opportunity, emailed the FOH office stating, "[W]e are in a bad position

with this employee [Willar]. He was hired for a certain position and we have not given him

a valid reason for not letting him enter the building. The medical evaluation is the only way

we will be able to validate our position." (Id. ¶ 76).

Willar did not meet with an FOH physician to conduct his evaluation until May 15,

2017, roughly three months after his initial request for an accommodation and roughly two

months into his temporary detail to Dahlgren. (Id. ¶ 77). One week later, Willar submitted

a formal EEO complaint alleging disability discrimination and retaliation. (Id. ¶ 96). On

June 20, 2017, still having received no word regarding the status of his request for an

accommodation, Willar requested a separate accommodation—that MDA permit him to

perform his Dahlgren work from the Elkton facility, which was much closer to his home.

(Id. ¶ 82). Sheahan denied the request on July 27, 2017, asserting that "MDA cannot allow

an MDA employee to reside in a commercial company facility and perform daily duties

not associated with the work performed at that site." (Id. ¶ 83). Willar, however, identified

two other employees—Fisher and Ray Chowdhury—who performed non-Elkton work at

the Elkton facility. (Id. ¶¶ 84–86). Regardless, still awaiting a response to his initial

accommodation request, Willar submitted yet another request for an accommodation on August 9, 2017, this time seeking permission to work "at any 'government owned location' closer to his residence." (Id. ¶ 88). Almost one month later, Sheahan denied the request. (Id. ¶ 89).

Beginning in August 2017, Miller began to pressure Willar to accept a permanent job offer in Dahlgren. (Id. ¶ 90). Willar found the Dahlgren position less attractive than the MAR position for several reasons, including that the Dahlgren position was a supervisory role and that it would require international travel. (Id. ¶¶ 91–92). On November 14, 2017, however, Sheahan "formally denied in writing Willar's request to wear a respirator at the Elkton facility while performing the duties of an MAR." (Id. ¶ 93). This decision "forced Willar to accept the permanent position in Dahlgren." (Id. ¶ 94).

**B.    Procedural Background**

Willar submitted his initial pre-complaint EEO intake form on April 4, 2017. (Id. ¶ 95). He then submitted his formal EEO complaint on May 22, 2017. (Id. ¶ 96). Willar filed his Complaint in this Court on September 20, 2019. (ECF No. 1). The two-count Complaint alleges: disability discrimination in violation of the Rehabilitation Act of 1973 (Count I); and retaliation in violation of the Rehabilitation Act of 1973 (Count II). (Id. ¶¶ 99–121). Willar seeks compensatory and consequential damages, attorneys' fees and costs, and a declaratory judgment affirming DoD's unlawful actions. (Id. at 19).

On March 11, 2020, DoD filed a Motion to Dismiss. (ECF No. 11). Willar filed an Opposition on June 17, 2020. (ECF No. 14). That same day, Willar filed a Motion for Discovery and attached an affidavit from counsel setting forth specific relevant information

he could obtain through discovery. (ECF No. 15). DoD filed a joint Reply and Opposition to Willar's Motion for Discovery on July 1, 2020. (ECF No. 16). Willar filed a Reply in Support of his Motion for Discovery on July 15, 2020. (ECF No. 17).

## II.    STANDARD OF REVIEW

### A.    Conversion

DoD styles its Motion as a Motion to Dismiss, or in the Alternative, for Summary Judgment. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters

outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 954 (4th Cir. 1995)).

Willar argues that it would be premature to construe DoD's Motion as one for summary judgment because he has not had a reasonable opportunity for discovery. In

addition, counsel for Willar has submitted an affidavit, in accordance with Rule 56(d), setting forth several detailed categories of discovery that could establish a genuine issue of material fact in this dispute.

Through his Motion for Discovery and the attached affidavit, Willar identifies an array of information that could prove essential to his claims of retaliation and discrimination. For instance, although Willar was able to engage in some limited discovery during the federal EEO investigative process, he was not able to gather documentary and testimonial evidence from third parties like Orbital ATK, which could potentially provide relevant information about the use of respirators in its facilities. This information could prove particularly salient because there is a dispute of fact about whether Orbital ATK permits the use of respirators, and because Willar asserts that MDA pressured Orbital ATK into making its determination regarding the safety of his respirator. (See Sinisi Aff. ¶¶ 9–11, 15–23, ECF No. 15-1).[4] Willar also notes that he has not been provided the Orbital ATK policies on which it purportedly based its determination regarding his respirator. (Id. ¶¶ 12–14). Willar further states that due to DoD's dilatory tactics, he did not have the opportunity to depose key witnesses, including MDA management employees, concerning Orbital ATK policies and other relevant information. (Id. ¶¶ 63–67). In light of email correspondence quoted in the Complaint that could suggest animus toward Willar's disclosure of his disability and requests for accommodation, the testimony of management

---

[4] Willar appears to have mistakenly failed to file the Sinisi Affidavit as a separate attachment to his filing. The affidavit begins on page eighteen of Willar's Memorandum in Support of his Motion for Discovery.

officials involved in assessing Willar's requested accommodation—and, indeed, the reasons behind the delay in making that determination—could prove highly relevant in proving or disproving Willar's claims or DoD's defenses.

DoD asserts that its Motion can be granted "on grounds otherwise unrelated to" the information sought by Willar in his Motion for Discovery. (Def.'s Reply Mem. Law Supp. Def.'s Mot. Dismiss Compl. Alt. Summ. J. & Opp'n Pl.'s Reqs. Disc. ["Def.'s Reply"] at 7, ECF No. 16). For example, DoD specifies that "the issue of whether Willar is substantially limited in a major life activity . . . ha[s] nothing to do with Orbital ATK or its policies." (Id.). But Willar's Complaint articulated many ways in which his RADS substantially limits major life activities, including the major life activity of breathing. (See Compl. ¶¶ 10–19). DoD, in turn, relies on an evaluation conducted by a pulmonologist retained by FOH for its conclusion that Willar's Complaint misrepresents the extent of the limitations caused by his RADS. (See Mem. Law Supp. Def.'s Mot. Dismiss Alt. Summ. J. ["Def.'s Mot."] Ex. E ["Tauber Letter"], ECF No. 11-6). The Court declines at this stage to find that Tauber's letter is dispositive regarding the extent of Willar's limitations. In particular, the Tauber letter does not appear to conclusively disprove Willar's allegation that his RADS substantially limits his ability to breathe.

In addition, DoD claims that evidence arising from third parties cannot establish that "Willar could perform the essential functions of the MAR position while wearing a respirator mask" and that Willar's claims of retaliation do not relate to Orbital ATK. (Def.'s Reply at 7). The Court disagrees. Evidence from Orbital ATK regarding the use of respirators at the Elkton facility goes to both Willar's ability to perform the essential

functions of the job and to establishing that DoD's reasons for relocating Willar and otherwise denying his requests for accommodation were pretextual.

Thus, the Court is satisfied that the evidence sought by Willar could establish a genuine dispute of material fact sufficient to defeat summary judgment. Accordingly, the Court will construe DoD's Motion as a motion to dismiss and will grant Willar's Motion for Discovery (ECF No. 15). Despite this, the Court "may consider documents . . . attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed." Sposato v. First Mariner Bank, No. CCB-12-1569, 2013 WL 1308582, at *2 (D.Md. Mar. 28, 2013); see CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009). Courts in the Fourth Circuit have routinely determined that EEO documents like the ones attached to DoD's Motion are integral documents in employment discrimination actions. See, e.g., Britt v. Brennan, No. RDB-19-0401, 2020 WL 1701711, at *2 (D.Md. Apr. 8, 2020); Battle v. Burwell, No. PWG-14-2250, 2016 WL 4993294, at *9 n.8 (D.Md. Sept. 19, 2016); Mustafa v. Iancu, 313 F.Supp.3d 684, 687 (E.D.Va. 2018); Lee v. Esper, No. 18-3606-TLW-KFM, 2019 WL 7403969, at *3 (D.S.C. Aug. 13, 2019), report and recommendation adopted, 2020 WL 32526 (D.S.C. Jan. 2, 2020). As such, the Court will consider the EEO documents attached to the Motion to Dismiss as integral documents. Federal employees, however, have "the same right [of action] as 'private sector' employees enjoy" and a federal employee is entitled to a "trial de novo" on his claims of discrimination and retaliation. Chandler v. Roudebush, 425 U.S. 840, 841, 844–45 (1976). Accordingly, the Court will disregard any disputed findings of fact or law

set forth in the documents attached to DoD's Motion as Exhibits A and B (ECF Nos. 11-2, 11-3).

## B.      Rule 12(b)(6) Standard

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268

(1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### III.   ANALYSIS

### A.   Disability Discrimination (Count I)

Willar alleges that DoD denied him a reasonable accommodation in violation of the Rehabilitation Act. To establish a prima facie claim for failure to accommodate under the Rehabilitation Act of 1973, Willar must demonstrate that: (1) he was a qualified individual with a disability; (2) DoD had notice of the disability; (3) Willar could perform the essential functions of the position with a reasonable accommodation; and (4) DoD nonetheless refused to make the accommodation. See Hannah P. v. Coats, 916 F.3d 327, 337 (4th Cir. 2019).

Thus, Willar's claim requires that he first adequately allege that he is a "qualified individual with a disability." See, e.g., Shin v. Univ. of Md. Med. Sys. Corp., 369 F.App'x 472, 479 (4th Cir. 2010) ("For both wrongful termination and the failure to provide reasonable accommodation, a plaintiff must first establish that he is a 'qualified individual with a disability' under the ADA."). The Rehabilitation Act adopts the Americans with Disabilities Act's ("ADA") definition of "disability," see 29 U.S.C § 705(9)(B), including the amendments to the definition in the ADA Amendments Act of 2008 ("ADAAA"), Brady v. Bd. of Educ. of Prince George's Cnty., 222 F.Supp.3d 459, 468

14

(D.Md. 2016), aff'd, 707 F.App'x 780 (4th Cir. 2018). The ADAAA defines a disability as: "(1) 'a physical or mental impairment that substantially limits one or more major life activities' (the 'actual-disability' prong); (2) 'a record of such an impairment' (the 'record-of' prong); or (3) 'being regarded as having such an impairment' (the 'regarded-as' prong)." Summers v. Altarum Inst., Corp., 740 F.3d 325, 328 (4th Cir. 2014) (citing 42 U.S.C. § 12102(1)).

Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Major life activities also include "the operation of a major bodily function, including but not limited to . . . respiratory . . . functions." Id. § 12102(2)(B). A major life activity is "substantially limit[ed]" if the impairment "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Determining whether an activity is substantially limited "usually will not require scientific, medical, or statistical analysis." Id. § 1630.2(j)(1)(v). Finally, the ADAAA provides that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

In this case, Willar alleges that RADS impairs his ability to breathe, take stairs, carry heavy objects, exercise, or play sports, and that he is forced to use a respirator to protect

his lungs from airborne irritants. (Compl. ¶¶ 10–15). The Court is satisfied that Willar adequately alleges that his RADS substantially limits one or more major life activities. Moreover, there is no question that DoD was on notice of his disabilities.

Willar must next plausibly allege that he could perform the essential functions of the position with a reasonable accommodation. "An employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform all of the essential functions of her position." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 581 (4th Cir. 2015) (emphasis in original). DoD asserts that Willar's claim must fail because "even if it were reasonable to permit Willar to wear a respirator in the facility, he could not perform all the essential functions of the MAR job duties because wearing a respirator would interfere with inspection duties." (Def.'s Mot. at 21). In support of this position, DoD relies on a report authored by Sheahan in which he asserts that "[a] respirator extends approximately 3 inches from the user's face. A MAR must be able to put his/her face into very close proximity to critical hardware to inspect the hardware." (Def's Mot. Ex. B ["EEO Investigative File"] at 39, ECF No. 11-3).[5] DoD further asserts that Willar's respirator could create a dangerous condition for Willar and his colleagues due to a physical reaction that could arise from the interaction between certain parts of the respirator and chemicals and/or electrostatic conditions present in the facility. (Id. at 39–40).

Willar alleges in his Complaint, however, that he had previously used a respirator during employment in similar jobs, including "as a Quality Manager at a BAE Systems

---

[5] Citations to exhibit page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

manufacturing plant, and as a Process Quality Engineer at Naval Air Station Patuxent River ('NAVAIR') Defense." (Compl. ¶ 17). Willar also alleges that other employees in the Elkton facility routinely use silicone respirators and that "disposable respirators are used throughout the Elkton facility" for several different processes. (Id. ¶¶ 46–48). Accordingly, Willar plausibly alleges that he "could perform the essential functions of his job as an MAR at the Elkton facility while using a respirator." (Id. ¶ 104).

Relying on Sheahan's report, DoD disputes this fact, correctly noting that the Court "may consider defendant's exhibits when analyzing whether plaintiff has stated a claim under Rule 12(b)(6)." (Def.'s Reply at 3). But the Court need not take disputed facts set forth in those exhibits as gospel, particularly before Willar has had the opportunity to conduct meaningful discovery. Moreover, Willar has identified evidence suggesting that "MDA predetermined that Willar would never work for MDA in the Elkton plant, with or without accommodations, then spent the ensuing months building a written record to support the decision not to accommodate him." (Pl.'s Opp'n Mot. Dismiss ["Pl.'s Opp'n"] at 11–12, ECF No. 14; see also Compl. ¶¶ 30–49, 76). To the extent the Sheahan report is tainted by bias, as Willar has alleged, the conclusions contained therein cannot disprove Willar's allegations at the motion-to-dismiss stage of the proceedings. The Court is thus satisfied at this stage that Willar has sufficiently alleged that he could perform the essential functions of the MAR position with a reasonable accommodation.

Finally, Willar must establish that DoD refused to make a reasonable accommodation. DoD asserts that it did accommodate Willar's disability—albeit not in the way that Willar requested—by relocating Willar to the Dahlgren office. As DoD correctly

notes, the Rehabilitation Act does not require an employer to provide the accommodation of the employee's choice. Hannah P., 916 F.3d at 338. Rather, "the employer 'has the ultimate discretion to choose between effective accommodations.'" Id. at 337 (quoting Reyazuddin v. Montgomery Cnty., 789 F.3d 407, 415–16 (4th Cir. 2015)). However, "reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship." 29 C.F.R. § Pt. 1630, App. at 1630.2(o).

Willar has alleged that DoD's accommodation was not reasonable, both because the conclusions that his respirator was unsafe and rendered him unable to perform his duties were biased and inaccurate, and because the burden placed on him to commute to a job site 150 miles from his home was unreasonable. Willar emphasizes this point by stating that he could have performed the duties of his Dahlgren position remotely from the Elkton facility or some other location—an additional accommodation he later requested and DoD denied. Relying on Sheahan's statements to investigators, DoD responds that "MDA could not have federal employees working in a commercial facility doing work not associated with work being conducted at that facility." (Def.'s Reply at 17). Willar responds that this is not true, and identifies two employees, Chowdhury and Fisher, who were permitted to work in Elkton while doing non-Elkton work. (See Compl. at ¶¶ 85–86). Relying on statements Sheahan provided to EEO investigators, DoD asserts that this is false, and that those two individuals performed MAR work while at the Elkton facility. (EEO Investigative File at 100). DoD states that Willar "offers no evidence or argument to demonstrate that [the statement regarding the nature of Chowdhury and Fisher's work at the Elkton facility] is

incorrect." (Def.'s Reply at 18). This argument misapprehends Willar's burden. This case is before the Court on DoD's Motion to Dismiss; Willar's plausible allegation is sufficient.

At bottom, the Court finds that for the purposes of surviving a motion to dismiss, Willar has adequately alleged that he was denied the accommodation he sought and that the alternative accommodation DoD provided was not reasonable. Accordingly, Willar has articulated a prima facie case for failure to accommodate in violation of the Rehabilitation Act, and DoD's Motion to Dismiss will be denied as to Count I.

**B.  Retaliation (Count II)**

"Although the Rehabilitation Act does not have a specific retaliation provision, it incorporates the remedies applicable under the Americans with Disabilities Act including 42 U.S.C. § 12203(a), which makes it unlawful to retaliate against individuals for making a charge, testifying, assisting, or participating in an investigation, proceeding or hearing regarding charges of disability discrimination." Dones v. Donahoe, 987 F.Supp.2d 659, 671 n.4 (D.Md. 2013) (citing 29 U.S.C. § 794a). To establish a prima facie case of retaliation under the Rehabilitation Act, the plaintiff must allege that: (1) "he engaged in a protected activity"; (2) "his employer acted adversely against him"; and (3) "the protected activity was causally connected to the adverse action." Id. at 671.

DoD does not dispute that Willar's requests for accommodation are a protected activity. Instead, DoD contends that Willar fails to adequately allege that he suffered an adverse action. The Court disagrees.

To allege an adverse action for the purposes of a Rehabilitation Act retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted); see also Williams v. Balt. City Cmty. Coll., No. GLR-12-238, 2014 WL 4784320, at *5 (D.Md. Sept. 23, 2014) (quoting Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007)) (applying the Title VII retaliation factors from Holland to the plaintiff's ADA claims). Thus, the burden of establishing an adverse action in a retaliation claim is lower than that of discrimination. See White, 548 U.S. at 64–67 ("[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Indeed, "'the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm' because '[a]n employer can effectively retaliate against an employee by taking actions not directly related to his [or her] employment or by causing him [or her] harm outside the workplace.'" Strothers v. City of Laurel, 895 F.3d 317, 327 (4th Cir. 2018) (alteration in original) (quoting White, 548 U.S. at 63, 67).

Here, Willar alleges that DoD retaliated against him by, inter alia, "detailing [him] to the ABQ office in Dahlgren, Virginia for a 'temporary' assignment, effective March 13, 2017; . . . revoking approval for Plaintiff's [compressed work schedule] on March 14, 2017; . . . [and] denying [Willar's] request to perform his Dahlgren or any MDA duties from the Elkton facility" or other facilities closer to Willar's home. (Compl. ¶ 118). DoD counters that "much of what Willar complains of are part of the process the agency utilized in assessing and providing a reasonable accommodation to him. As such, these cannot

constitute an adverse action." (Def.'s Mot. at 28). However, DoD provides no authority to support this contention, and the inaccuracy of its blanket assertion is made plain by a simple hypothetical: if a plaintiff alleged that in response to his request for an accommodation, his employer provided an alternative accommodation by transferring him to work in a mine in Siberia, a court could reasonably find that the employer's actions might have dissuaded a reasonable worker from requesting an accommodation.

In this case, Willar alleges that in response to his request for an accommodation, DoD assigned him to a "temporary" detail in the Dahlgren office, 150 miles from his home. Willar alleges that the assignment forced him to stay in a hotel in Dahlgren during the week, an arrangement that "disrupted all aspects of Willar's personal life" and "negatively impacted his diet and sleep patterns." (Compl. ¶ 67). Moreover, while Sheahan described the reassignment as an "estimated 2-week trip to our offices in Dahlgren VA," (Compl. ¶ 59), Willar spent approximately eight months in Dahlgren before MDA finally concluded that it could not accommodate his request to work in the Elkton facility. The Court finds that causing that level of disruption to an employee's personal life for an indeterminate and, ultimately, very lengthy period of time could have dissuaded a reasonable worker from requesting an accommodation.

This is not to say that every failure to accommodate necessarily constitutes unlawful retaliation. For instance, if, while evaluating Willar's request for an accommodation, DoD allowed him to work in some other capacity at the Elkton facility while promptly reviewing the safety and viability of his request, the Court would be hard-pressed to find that such an action would dissuade a reasonable worker from seeking an accommodation. But uprooting

21

an individual against his will for the better part of a year is materially adverse and, if the individual can establish that the stated reason for his reassignment was pretextual and was instead motivated by discriminatory animus, is retaliatory.

DoD has not made an argument as to causation, likely because there is little question that Willar has sufficiently alleged that his request for an accommodation caused DoD's decision to reassign him to Dahlgren. Thus, Willar has adequately alleged a prima facie case of unlawful retaliation in violation of the Rehabilitation Act. Accordingly, the Court will deny DoD's Motion to Dismiss Willar's retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny DoD's Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 11). The Court will grant Willar's Motion for Discovery (ECF No. 15). A separate Order follows.

Entered this 18th day of November, 2020.

_____/s/_____
George L. Russell, III
United States District Judge